IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO. 1:15-CR-223-LMM-LTW |
| v. | |
| BRYANT TERRANCE COOPER, | |
| Defendant. | |

**MAGISTRATE JUDGE'S ORDER AND FINAL REPORT AND RECOMMENDATION**

Pending before this Court is Defendant Bryan Terrance Cooper's ("Defendant") Motion to Suppress Statements (Doc. 20) and Preliminary Motion to Suppress Evidence (Doc. 21). Having considered Defendant's motions, the parties' briefs, and all supporting documents submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendant's Motion to Suppress Statements be **GRANTED**. (Doc. 20). Defendant's Preliminary Motion to Suppress Evidence should be **DENIED**. (Doc. 21).

Also before the Court is Defendant's Motion to Continue the Filing Date of Defendant's Post-Hearing Brief. (Doc. 40). Therein, Defendant requests through and including June 27, 2016, to file his post-hearing brief. Defendant's Motion to Continue is **GRANTED**. (Doc. 40). The time through June 27, 2016, is excluded under the

AO 72A
(Rev.8/82)

Speedy Trial Act. 18 U.S.C. § 3161(h)(7). There are no further motions or problems pending before the undersigned to prevent the scheduling of this case for trial. Therefore, this action is **CERTIFIED READY FOR TRIAL**.

## DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

In May 2015, the Grand Jury in the Northern District of Georgia indicted Defendant knowingly, using, persuading, inducing, enticing a minor to engage in sexually explicit conduct as defined in 18 U.S.C. § 2256(2) for the purpose of producing a visual depiction of such conduct in violation of 18 U.S.C. § 2251(a), (e). Defendant contends in his Motion to Suppress Statements (Docs. 20, 42) that law enforcement officers violated his Fifth Amendment rights when they elicited incriminating statements from him while he was in custody even though he invoked his right to an attorney. The Government contends that Defendant knowingly and voluntarily waived his rights and made statements after receiving Miranda warnings.

## I.   BACKGROUND

In March 2014, Special Agent Brian Szczepanski of the Federal Bureau of Investigation ("SA Szczepanski") obtained a search warrant from the DeKalb County Superior Court for the search of Defendant's apartment. (Tr. 6). (Transcript of April 14, 2016 Evidentiary Hrg., hereinafter "Tr.," 6-7). At the time, SA Szczepanski also possessed an arrest warrant for Defendant. (TR. 10). On March 4, 2014, at 6:00 a.m., SA Szczepanski and more than fifteen other law enforcement officers executed the warrants. (Tr. 7, 10, 20-23). The officers were armed with handguns and long guns.

2

(Tr. 26-27). Initially, between six and eight law enforcement officers made contact at the front door of the apartment, but battered the door down when no one answered. (Tr. 8, 25-27; Def.'s Exs. 4-6). Once the officers entered into the apartment, they discovered that a male and a female were lying on the floor sleeping only feet from the doorway. (Tr. 8). The officers conducted a security sweep for weapons and discovered Defendant fully dressed and laying on the floor of his bedroom. (Tr. 9). Defendant was secured in handcuffs and was kept in an eating area of the apartment. (Tr. 29). Agents Szczepanski and Hipkiss transported Defendant to a DeKalb County Police Station, at approximately 7:16 a.m. (Tr. 11, 19, 30; Def.'s Ex. 1). Defendant was handcuffed. (Tr. 30). At 7:36 a.m., the agents stopped at a Chick-fil-a and purchased breakfast for Defendant. (Def.'s Ex. 1; Tr. 20).

The agents and Defendant arrived at the DeKalb County Police Station at 7:50 a.m. and the agents placed Defendant in an interview room so that the agents could interview him. (Tr. 11, 31; Def.'s Ex. 1). The room contained a table and chairs, and Agent Jamie Hipkiss and SA Szczepanski were present. (Tr. 11, 31). At some point, Agent Hipkiss left the room and a female detective from the police department took her place. (Tr. 16-17). Defendant was no longer handcuffed. (Tr. 17). Although the room had audio recording equipment, the interview was not recorded. (Tr. 36). SA Szczepanski read Defendant his rights around 8:25 a.m. in a conversational tone and placed a form indicating Defendant's rights in front of him. (Tr. 12, 14, 31-32; Gov't's Ex. 1). Neither the agents nor the detective wore firearms. (Tr. 16-17). Neither SA

3

Szczepanski nor Agent Hipkiss made promises or threats to Defendant, and Defendant did not appear to be under the influence of alcohol, drugs, or medications. (Tr. 16-18). Defendant also did not appear to suffer from a mental impairment. (Tr. 18). After SA Szczepanski read Defendant's rights, Defendant told SA Szczepanski that he wanted a lawyer. (Tr. 12, 33). SA Szczepanski admits that Defendant asked for a lawyer close to the time that SA Szczepanski read Defendant's rights to him. (Tr. 42).

The agents next gave Defendant an opportunity to eat breakfast and to review a copy of the complaint affidavit or the search warrant.[1] (Tr. 12). SA Szczepanski then explained the criminal process to Defendant. (Tr. 13, 35). SA Szczepanski also explained to Defendant that his situation was different because he was arrested in connection with a warrant issued in the Middle District of Georgia, but was being arrested in Atlanta, Georgia, and would have to attend court in Macon, Georgia, before his case would be transferred to Athens, Georgia. (Tr. 13). SA Szczepanski testified that he could not remember specifically "word for word how things went down" because the interview occurred more than two years ago. (Tr. 35). SA Szczepanski admits, however, that it was not FBI procedure to explain how the federal process is different from the state process. (Tr. 37). SA Szczepanski testified that it is his procedure to do so. (Tr. 37). When accounting for the approximately hour and a half between the first time SA Szczepanski read Defendant's rights to him at 8:25 a.m. and the time Defendant

---

[1] SA Szczepanski subsequently testified that he is unsure whether he gave Defendant a copy of his Complaint before or after he gave him the advice of rights form. (Tr. 33-34).

4

actually waived his rights at approximately 9:59 a.m., SA Szczepanski states that some of that time might have been Defendant eating his breakfast and the agents leaving and entering the room. (Tr. 45-46, 57).

SA Szczepanski testified that after Defendant read the Complaint, Defendant began making statements about a boy in Athens and asserted that he did not know that the boy was twelve years old. (Tr. 13). At that point, SA Szczepanski readvised Defendant of his rights in a conversational tone. (Tr. 13-14). Defendant then signed the advice of rights form and began talking with SA Szczepanski. (Tr. 13-14; Gov't's Ex. 1). The advice of rights form indicates that it was executed at 9:59 a.m. (Gov't's Ex. 1; Tr. 44-45). As part of the advice of rights, Defendant was advised that he could choose to answer or could stop answering questions. (Tr. 15). During the interview, Defendant sometimes refused to answer questions, sometimes said "no comment," or and sometimes refused to answer questions without a lawyer present. (Tr. 15, 47). The interview concluded some time after 1:00 p.m. (Tr. 49).

## LEGAL ANALYSIS

Defendant contends in his Motion to Suppress Statements (Docs. 20, 42) that law enforcement officers violated his Fifth Amendment rights when they elicited incriminating statements from him while he was in custody even though he invoked his right to an attorney. In support, Defendant contends that he unambiguously invoked his right to counsel after SA Szczepanski initially read his rights to him and that SA Szczepanski, instead of ending the interrogation, extensively explained the process to

5

him in an effort to persuade him to participate in the interview. Defendant points out that the circumstances of this case are identical to United States v. Johnson, 812 F.2d 1329 (11th Cir. 1986), in which the Eleventh Circuit concluded that statements made after the defendant invoked his right to counsel and the Government then "explained the process" should be suppressed. The Government contends that Defendant knowingly and voluntarily waived his rights when he made statements after receiving Miranda warnings.

The Fifth Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial. U.S. Const. amend. V; Dickerson v. United States, 530 U.S. 428, 433 (2000). In Miranda v. Arizona, the Supreme Court declared that an accused also has a Fifth Amendment right to have counsel present during a custodial interrogation. Edwards v. Arizona, 451 U.S. 477, 481 (1981), citing Miranda v. Arizona, 384 U.S. 436, 474 (1966). The purpose behind the Fifth Amendment protection of the right to counsel "is . . . the prophylaxis of having an attorney present to counteract the inherent pressures of custodial interrogation" and to keep police from badgering a defendant into waiving his previously asserted Miranda rights. Edwards, 451 U.S. at 685. Once the accused has invoked his right to counsel, interrogation by law enforcement officers must cease until counsel has been made available to him, unless the accused himself initiates further conversations with law enforcement personnel. Edwards, 451 U.S. at 484-85. Readvising the accused of his Miranda rights before any further interrogation does not

6

immunize the law enforcement officers from the consequences of failing to cease interrogation once the accused invokes his right to counsel. Edwards, 451 U.S. at 686-87; Isaacs v. Head, 300 F.3d 1232, 1262 (11th Cir. 2002). When the accused invokes his right to have counsel present during a custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to police-initiated custodial interrogation even if he has been advised or readvised of his rights. Edwards, 451 U.S. at 484-85, 487; Isaacs, 300 F.3d at 1261.

In this case, Defendant unequivocally invoked his right to have representation by an attorney. In the interrogation room, when SA Szczepanski read Defendant his Miranda warnings, Defendant stated that he wanted a lawyer and SA Szczepanski admits that he understood that Defendant was requesting a lawyer for himself. (Tr. 12, 33, 42); United States v. Thomas, 521 F. App'x 878, 882 (11th Cir. 2013) (explaining that defendant's indication that she was not talking without a lawyer was a clear invocation of the right to counsel).

Because Defendant invoked his right to representation, SA Szczepanski and his colleagues were required to stop the interrogation. If a suspect in custody unequivocally invokes his right to counsel, law enforcement must stop interrogation until counsel has been made available to him. Edwards, 451 U.S. at 486. Law enforcement officers may not ask questions, discuss the case, or present the accused with possible sentences and the benefits of cooperation. Thomas, 521 F. App'x at 882 (explaining that once defendant invoked right to counsel, the officer could no longer ask questions or discuss

7

the case); United States v. Gomez, 927 F.2d 1530, 1539 (11th Cir. 1991) ("The law in this area is clear: once an accused requests counsel, the officer cannot ask questions, discuss the case, or present the accused with possible sentences and the benefits of cooperation.").

Here, the Government argues Defendant's statements following the invocation of his right to counsel were the product of his free choice and that no interrogation occurred after Defendant invoked his right to counsel. In support, the Government argues instead, that Defendant himself initiated the discussion with the agents. This Court disagrees and concludes that after Defendant invoked his right to counsel, SA Szczepanski violated Defendant's rights when he engaged in the functional equivalent of interrogation. The "functional equivalent" of express questioning occurs when officers use "any words or actions . . . (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). By contrast, "'[v]oluntary and spontaneous comments by an accused" are admissible evidence if the comments were not made in response to government interrogation. United States v. Sanders, 315 F. App'x 819, 823 (11th Cir. 2009) (quoting Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991)); see also Miranda, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment . . . .").

Here, instead of concluding the interrogation, SA Szczepanski "explained the process" to Defendant. The Eleventh Circuit has held that law enforcement-initiated

8

explanations of the process following the defendant's invocation of his right to counsel are a continuation of the interrogation. In a similar case, United States v. Johnson, 812 F.2d 1329 (11th Cir. 1986), law enforcement officers read the defendant his Miranda rights and the defendant responded that he wanted a lawyer present during questioning. Id. at 1330. Following this exchange, the FBI agent asked the defendant if he would like to have the federal criminal process explained and the defendant responded, "yes." Id. at 1330. "The agent described the federal criminal process concerning appearances before a magistrate, the setting of bond, and the possible appointment of a public defender." Id. The FBI agent further explained that the FBI was involved in the matter because the credit union was federally insured. Id. After hearing the FBI agent's explanation, the defendant responded, "All this trouble, all for trying to get some money." Id.

The Eleventh Circuit held that the defendant's statement following his invocation of his right to counsel should have been suppressed. Id. at 1331. Because the defendant had invoked the right to the presence of a lawyer, the interrogation and discussion should have ceased. Id. The Eleventh Circuit explained:

> The FBI's question and continuing discussion was more than "a bare inquiry by either defendant or by a police officer which should not be held to initiate any conversation or dialogue." Oregon v. Bradshaw, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983).
>
> While stating to an accused in custody that the criminal justice system will be explained sounds innocent enough, those familiar with the criminal arena are well aware of the fact that such an "explanation" is often designed to inform the accused that cooperation may be beneficial when a judicial officer considers such matters as bail. This type of helpfulness

9

>is often used to indicate to the accused that the law enforcement officers will "be good if the accused will be good," or infer "Why don't you be good and tell us about it."

Johnson, 812 F.2d at 1331.  The Eleventh Circuit further explained that "[i]n cases presenting this issue, we will begin our review with suspicion, mindful of the fact that the inculpatory statement may have resulted from what has become known as the 'good guy routine.'" Id. at 1331.

Just as in Johnson, SA Szczepanski's "discussion of the process" is not consistent with the constitutional requirement that he stop the interrogation until Defendant was represented by counsel.  Here, despite Defendant's request for counsel, under applicable case law, SA Szczepanski functionally continued the interrogation by discussing the process with Defendant for up to an hour and a half.  This extended discussion of the process amounted to custodial interrogation in violation of Defendant's Fifth Amendment rights and puts this case squarely within the facts of Johnson.  Johnson, 812 F.2d at 1330-31.  Just like in Johnson, SA Szczepanski's testimony clearly shows SA Szczepanski discussed Defendant's case with him. (Tr. 35).  SA Szczepanski testified that he remembers "explaining . . . the process of the Complaint and how we got that and how he was charged and how we were able to arrest him that day."  (Tr. 35). Furthermore, although SA Szczepanski provides little detail of what was discussed between the time SA Szczepanski initially read Defendant his rights at 8:25 a.m. and the time that Defendant actually waived his rights at 9:59 p.m., it appears that SA Szczepanski may have extensively discussed the case with Defendant.  For up to ninety

10

minutes, SA Szczepanski explained the charges, the process in the federal system, and how Defendant's case started in Atlanta, Georgia, but ultimately would be transferred to Athens, Georgia. (Tr. 12-13, 35, 37, 45-47, 57). Although SA Szczepanski states that some of the hour and a half may have been accounted for by Defendant eating his breakfast and agents leaving and entering the room, SA Szczepanski does not allege that these activities took any significant amount of time. (Tr. 45-46, 57). While SA Szczepanski asserts that he did not talk with Defendant about the benefits of cooperation, SA Szczepanski appears to have very little memory of the specifics of what was discussed. (Tr. 35 (explaining that he cannot remember "word for word how things went down" because the interview was more than two years ago), 41-42). Certainly, had Defendant been able to contact the lawyer he requested, Defendant's lawyer would also likely be able to explain the process to Defendant, without putting his rights at risk. See Gomez, 927 F.2d at 1539 (explaining that once the accused requests counsel "[a]ny information or discussion regarding the case should be addressed to the accused's attorney"). Viewed with the suspicion the Eleventh Circuit commands in Johnson, this Court cannot conclude that the Government met its burden of proving that SA Szczepanski's "helpfulness" in explaining the process was not designed to elicit statements from Defendant after he invoked his right to counsel. Accordingly, this Court concludes that the discussion of the process was interrogation.

The Government contends that the Court should reject the reasoning of Johnson because the Eleventh Circuit's decision in United States v. Valdez, 880 F.2d 1230 (11th

11

Cir. 1989), is more applicable to the facts at hand.  In that case, defendant Valdez initially cooperated with federal agents, but eventually indicated that he preferred to keep quiet and talk to his lawyer.  Valdez, 880 F.2d at 1232.  While en route to the correctional center, Valdez asked agents where they were going. 880 F.2d at 1232.  The agents told Valdez they were going to the correctional center and Valdez expressed his relief that he was not going to the Dade County jail.  Id.  One of the Agents then explained the procedures for initial appearance, the bond hearing, and appointment of counsel. Id.  The Agent further explained, "Hey, look, I understand the situation you are in.  We are not really all that concerned about your involvement.  You are just trying to make a couple of bucks to get through the week.  I understand that.  We are looking for people higher than you."  Id.  The agent further stated, "Look, when you get your attorney, if you feel that you should cooperate, you have to have an attorney with you when you cooperate so that it flows a little smoother."  Id.  Valdez then admitted that he "had to do this" because he has a wife, child, and a mortgage payment, but had no money and that he was not a bad person.  Id. at 1232-33.

The Eleventh Circuit concluded that Valdez's statement should not be suppressed because unlike the agents in Johnson, the agents in Valdez ceased interrogation upon Valdez's request for a lawyer.  Id. at 1234.  Valdez's statements did not result from the "good guy routine" warned of in Johnson, but rather from Valdez initiating a conversation with an agent.  Id.  The agent, who did not know of Valdez's prior request for counsel, merely responded to Valdez's question about his destination.  880 F.2d at

12

1234; United States v. Thomas, 521 F. App'x at 883 (also distinguishing Valdez on the grounds that the conversation with the agent and the defendant occurred hours after the initial request for an attorney and therefore any residual coercion was dissipated).

The instant case is more like Johnson and distinguishable from Valdez, however, because unlike the more innocent agent conduct in Valdez, Defendant Cooper did not initiate the conversation by asking SA Szczepanski about the process or evince a willingness and a desire for generalized discussion about the investigation. There is no indication here that Defendant was actively participating in the discussion of the process SA Szczepanski initiated. Instead, it appears that SA Szczepanski's "explanation of the process" appears to be more coercive because it may have occurred for up to an hour and a half before Defendant made any statements and SA Szczepanski readvised Defendant of his rights. Furthermore, unlike Valdez, the interrogation of Defendant did not occur at a later time by a different law enforcement officer. SA Szczepanski was fully aware that Defendant Cooper had invoked his right to counsel.

The Government also relies upon Rhode Island v. Innis, 446 U.S. 291 (1980), in support of the proposition that SA Szczepanski's explanation of the process was not the functional equivalent of interrogation. In support, the Government agues SA Szczepanski could not have reasonably expected that explaining the court procedure would have elicited incriminating statements. The problem with the Government's argument, however, is that the Eleventh Circuit has already concluded that explaining the process subsequent to the defendant's invocation of his rights amounts to the

13

functional equivalent of interrogation in <u>Johnson</u> and as such, could reasonably be expected to elicit incriminating statements.  The Eleventh Circuit has concluded that explaining the process after the defendant invokes his right to an attorney amounts to an implicit indication that cooperating with the police would be beneficial to him.  <u>See</u> <u>Christopher v. Fla.</u>, 824 F.2d 836, 842 (11th Cir. 1987) (describing the holding in <u>Johnson</u> as "following an invocation of right to counsel the police may not even implicitly indicate to the suspect that cooperating with the police would be beneficial to him"); <u>Johnson</u>, 812 F.2d at 1330-31 (explaining that although offering to provide an explanation of the criminal justice system sounds innocent, such an explanation is often designed to inform the accused that cooperation may be beneficial and that law enforcement officers "will be good if the accused will be good" or that the accused is "good" if the accused talked to officers).  The Eleventh Circuit has explained that "this type of helpfulness" is used to give the accused the inference that the "law enforcement officers will 'be good if the accused will be good,' or infer 'Why don't you be good and tell us about it?'" <u>Johnson</u>, 812 F.2d at 1331.  SA Szczepanski's actions here were not consistent with the purposes behind the Fifth Amendment protections of the right to counsel of counteracting "the inherent pressures of custodial interrogation" and keeping the police from badgering a defendant into waiving his previously asserted <u>Miranda</u> rights.  <u>Edwards</u>, 451 U.S. at 685

Furthermore, <u>Innis</u> is distinguishable.  In <u>Rhode Island v. Innis</u>, *supra*, an officer arrested the defendant, advised him of his <u>Miranda</u> rights, and waited for other officers

14

to arrive. Rhode Island v. Innis, 446 U.S. 291, 294 (1980). After a sergeant and a captain both arrived on the scene of the arrest and separately gave the defendant his Miranda warnings, the defendant responded that he understood his rights and wanted to speak with a lawyer. Id. The captain then directed that the defendant be driven to the central police station in a police car that had a wire screen mesh between the front and rear seats and instructed the officers not to question the defendant in any way. Id. Three officers entered the vehicle with defendant. While en route, one officer initiated a conversation with another officer about a missing sawed-off shotgun used in commission of a robbery for which defendant was suspected. Id. at 293-94. The officer advised the other officer in the defendant's presence that a school for disabled children was located nearby and that "god forbid one of [disabled children] might find a weapon with shells and they might hurt themselves." Id. at 294-95. The officer also stated that it would be too bad if a little girl "would pick up the gun, maybe kill herself." Id. at 295. The Supreme Court reasoned that the officers' discussion was not interrogation as contemplated by Miranda because not only were no questions posed to the defendant, but also the conversation was "nothing more than a dialogue between the two officers to which no response from the respondent was invited." Id. at 302. Moreover, the Supreme Court concluded that it could not be said that the officers should have known that their conversation was likely to elicit an incriminating response from the respondent because there was nothing in the record to suggest that the respondent was susceptible to an appeal to his conscience. Id. at 302-03.

15

In contrast, SA Szczepanski continued his conversation directly with Defendant after Defendant invoked his right to silence. Additionally, SA Szczepanski's subsequent comments directly related to Defendant's case. SA Szczepanski testified that he remembers "explaining . . . the process of the Complaint and how we got that and how he was charged and how we were able to arrest him that day." (Tr. 35). As discussed in Johnson, this lengthy discussion could be expected to elicit a response from Defendant. Accordingly, all statements made after Defendant invoked his right to representation, are inadmissible and should be **SUPPRESSED**. Gomez, 927 F.2d at 1536 (statements made by officers regarding benefits of cooperation and the possible severity of sentence made after invocation of right to counsel were impermissible interrogation); Johnson, 812 F.2d at 1331; cf. Christopher, 824 F.2d at 841-42, 845 (holding that the police may make routine inquiries of a suspect after he requests that they terminate questioning such as whether he would like a drink of water, but may not ask questions or make statements which open up a more generalized discussion relating directly or indirectly to the investigation, as this constitutes interrogation); United States v. Williams, No. 12-60116-CR-RNS, 2012 WL 4449439, at *1 (S.D. Fla. Sept. 26, 2012) (concluding that where detective told defendant "before we really talk to you, we have to explain your rights to you and everything," defendant responded, "I don't even wanna talk," and detective inquired, "You don't want to know what's goin' on," defendant's subsequent statements were inadmissible because defendant made an unambiguous assertion of his right to silence and further comment by the detective did

16

not scrupulously honor that right).

### DEFENDANT'S PRELIMINARY MOTION TO SUPPRESS EVIDENCE

On August 23, 2015, Defendant filed his preliminary Motion to Suppress Evidence the Government obtained during the execution of search warrants in 2014. In Defendant's motion, he indicated that he was filing a preliminary motion because he needs discovery from the Government in order to perfect the motion. On October 24, 2016, the undersigned Ordered Defendant to perfect his motion by November 10, 2106. Defendant did not do so. Accordingly, Defendant's Motion has been abandoned and should be **DENIED**. (Doc. 21); See, eg., United States v. Sanders, No. 3:15-CR-00010-TCB, 2015 WL 6684746, at *2 (N.D. Ga. Oct. 29, 2015) (concluding that where defendant was granted an extension to perfect motion, but did not do so, motion was deemed abandoned).

### CONCLUSION

Based on the aforementioned reasons, this Court **RECOMMENDS** that Defendant's Motion to Suppress Statements be **GRANTED**. (Doc. 20). Defendant's Preliminary Motion to Suppress Evidence should be **DENIED**. (Doc. 21). Defendant's Motion to Continue the Filing Date of Defendant's Post-Hearing Brief is **GRANTED NUNC PRO TUNC**. (Doc. 40). There are no further motions or problems pending before the undersigned to prevent the scheduling of this case for trial. Therefore, this action is **CERTIFIED READY FOR TRIAL**.

AO 72A
(Rev.8/82)

**SO ORDERED, REPORTED AND RECOMMENDED** this <u>16th</u> day of November, 2016.

<u>/s/ Linda T. Walker                    </u>
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO. 1:15-CR-223-LMM-LTW |
| v. | |
| BRYANT TERRANCE COOPER, | |
| Defendant. | |

**ORDER FOR SERVICE OF REPORT AND RECOMMENDATION**

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636 and N.D. Ga. CrR. 59(2)(a). Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b) (1), within fourteen (14) days after service of this order, each party may file written objections, if any, to the Report and Recommendation. Pursuant to Title 18, United States Code, Section 3161(h) (1) (D), (H), **the above-referenced fourteen (14) days allowed for objections is EXCLUDED from the computation of time under the Speedy Trial Act**, **whether or not the objections are actually filed**. If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time, all time between the filing of the R&R and the submission of the R&R, along with any objections, responses, and replies thereto,

to the District Judge.  18 U.S.C. § 3161(h)(1)(D), (H); <u>Henderson v. United States</u>, 476 U.S. 321, 331 (1986); <u>United States v. Mers</u>, 701 F.2d 1321, 1337-38 (11th Cir. 1983).

Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court.  If no objections are filed, the report and recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review.  <u>United States v. Slay</u>, 714 F.2d 1093 (11th Cir. 1983), <u>cert. denied</u>, 464 U.S. 1050 (1984).

The Clerk is directed to submit the report and recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED,** this <u>16th</u> day of November, 2016.

/s/ Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)